**Jerome G. KIRCHER, O.F.M., and Valens Waldschmidt, O.F.M., Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

Nos. 88–1523 to 88–1526.

United States Court of Appeals, Federal Circuit.

April 24, 1989.

James J. Ryan, Taft, Stettinuis & Hollister, of Cincinnati, Ohio, argued for plaintiffs-appellants. With him on the brief was Karen Ann Rolcik.

Howard M. Solomon, Dept. of Justice, of Washington, D.C., argued for defendant-appellee. With him on the brief were William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen and Ann Belanger Durney.

Before RICH, SMITH, and NEWMAN, Circuit Judges.

EDWARD S. SMITH, Circuit Judge.

In these federal income tax cases, Father Jerome G. Kircher and Father Valens J. Waldschmidt (collectively referred to as taxpayers) appeal from decisions of the United States Claims Court dismissing their complaints and denying them a refund of income taxes assessed by and paid

to the Internal Revenue Service (IRS).[1] Father Kircher sought a refund for the 1978, 1980, and 1981 tax years, whereas Father Waldschmidt sought a refund for the 1978 and the 1981 tax years (tax years in question). We affirm.

### Issue

The issue on appeal is whether the Claims Court erred in holding that the taxpayers had earned income as chaplains at public hospitals in their individual capacities and not as agents of their religious order.

### Background

#### A. The Taxpayers

The material facts in this case were stipulated by the parties. The taxpayers are ordained Roman Catholic priests and are members in good standing of the Province of St. John the Baptist of the Order of Friars Minor. This is an Ohio nonprofit corporation and is a subdivision of the Roman Catholic religious order commonly known as the Franciscans (Franciscan Order). A primary mission of the Franciscan Order is serving and administering to the poor and to the infirm. The Franciscan Order is, and was at all times during the tax years in question, an exempt organization as described in section 501(c)(3) of the Internal Revenue Code of 1954, as amended.[2]

As members of the Franciscan Order, the taxpayers were required to subscribe to and to obey vows of poverty and obedience. Father Kircher, on August 16, 1935, and Father Waldschmidt, on August 16, 1942, testified to their final and solemn vows of poverty and obedience. In accordance with their vows, the taxpayers executed a declaration renouncing all interest in ownership of compensation received for services performed while members of the Franciscan Order.

#### 1. Father Kircher and the Leper Hospital

Father Kircher, during the tax years in question, held the position of Roman Catholic chaplain at the National Leprosarium (now known as the National Hansen's Disease Center), Public Health Service, Department of Health, Education & Welfare in Carville, Louisiana (Leper Hospital). This position was a civil service position in the Federal Government. It was the practice of the Leper Hospital to have two chaplains in residence, one of whom was a Roman Catholic and the other a Protestant. Within the Roman Catholic Church, only an ordained priest may celebrate the Eucharist and administer the Sacraments according to its rites. Accordingly, only an ordained priest could serve as the Roman Catholic chaplain at the Leper Hospital.

All appointments to civil service positions at the Leper Hospital are made by the chief of the Personnel Office and are processed by the Personnel Office. The position of chaplain was under the general supervision of the chief of Rehabilitation Branch. This individual also evaluated Father Kircher's performance of his duties as described in his job description. Neither the Leper Hospital, the Public Health Service, nor the Civil Service Commission supervised the manner in which Father Kircher carried out his religious duties as chaplain. However, the Leper Hospital did establish the framework within which Father Kircher served. In addition, the Leper Hospital determined the manner and scope of Father Kircher's other activities which were not related to the actual conduct of religious rites or ceremonies or to his priestly function.

The Roman Catholic Diocese of Baton Rouge (Diocese) and its predecessor, the Roman Catholic Archdiocese of New Orleans (Archdiocese), have made Roman Catholic priests available to serve as chap-

---

**1.** *Kircher v. United States,* 14 Cl.Ct. 738 (1988) (denying refund for the 1978 tax year); *Kircher v. United States,* No. 597–87T (Cl.Ct. filed May 25, 1988) (denying refund for the 1980 and 1981 tax years); *Waldschmidt v. United States,* No. 695–81T (Cl.Ct. filed May 26, 1988) (denying

refund for the 1978 tax year); *Waldschmidt v. United States,* No. 599–87T (Cl.Ct. filed May 27, 1988) (denying refund for the 1981 tax year).

**2.** 26 U.S.C. § 501(c)(3) (1982).

lains at the Leper Hospital since 1896. Since 1959, the Franciscan Order has had an understanding with the Archdiocese, and subsequently the Diocese, that the Franciscan Order would provide from its members individuals to serve as chaplain at the Leper Hospital. The director of the Leper Hospital, the chief of the Rehabilitation Branch, and the chief of the Personnel Office had no knowledge of this understanding.

By letter dated June 7, 1971, the Franciscan Order advised Father Kircher that he had been assigned to the chaplaincy of the Leper Hospital. On June 15, 1971, using the Standard Form 171 of the United States Civil Service Commission, Father Kircher applied for the position. The Standard Form 171 submitted by Father Kircher was processed in accordance with the usual procedures of the Civil Service Commission and Father Kircher was interviewed by the chief of the Rehabilitation Branch at the Leper Hospital. During this process, Father Kircher understood that, although he had been assigned to the Leper Hospital by his religious superiors, he had not been hired as the chaplain and would not be unless the chief of the Personnel Office acted favorably upon his application form and appointed him to the position.

On or about June 30, 1971, Father Kircher was selected for the civil service position designated as Chaplain CA–494 IA. He entered duty on July 1, 1971. There was no written agreement between the United States and the Roman Catholic Church or any subdivision thereof regarding the employment of Father Kircher as a chaplain at the Leper Hospital.

Father Kircher was required by the Franciscan Order to assure that there was always a Roman Catholic chaplain available to patients of the Leper Hospital and, accordingly, was not permitted by the Franciscan Order to be absent from the hospital unless a replacement priest was available for the period of time he was to be absent. However, during Father Kircher's absences from the Leper Hospital, neither the Roman Catholic Church nor the Franciscan Order had any legal responsibility to pro-

vide a replacement. Father Kircher had an annual visitation by the Minister Provincial of the Franciscan Order, Father Kircher's religious superior, and various other visits by other members of the Franciscan Order. These occasions afforded the opportunity for these individuals to observe and to comment on Kircher's performance.

From July 1971 through November 1982, the Leper Hospital paid Father Kircher bi-weekly by means of a payroll check. These checks were made payable to Father Kircher, not to his religious order. Father Kircher endorsed and deposited his payroll checks in a checking account entitled "Franciscan Fathers, Chaplain P.H.S. Hospital, Carville, Louisiana." Father Kircher was the only individual authorized to sign checks on this account. On a regular basis, Father Kircher remitted to the Franciscan Order any amounts in the Franciscan Fathers checking account in excess of those retained for his daily living needs as permitted by the order. During his period of service as chaplain at the Leper Hospital, Father Kircher received paid annual leave, sick leave, and holidays.

2. *Father Waldschmidt and the Mental Hospital*

Father Waldschmidt, during the tax years in question, occupied the position of chaplain at the Longview State Hospital in Hamilton County, Ohio (now known as the Pauline Warfield Lewis Center and referred hereinafter as Mental Hospital), which position was a civil service position in the government of the State of Ohio. It is Ohio's practice that its psychiatric facilities have an organized pastoral service department, including a chaplain, to meet the needs of the patients and that this department function in connection with the other departments as part of the whole treatment of patient/residents. The Mental Hospital requires that the ecclesiastical body to which each chaplain is joined officially and properly appoint the individual to serve as a chaplain. This gives the chaplain ecclesiastical status and likewise includes official designation or ordination. Within the Roman Catholic Church, only an ordained priest may celebrate the Eucha-

rist and administer the Sacraments according to its rites. Accordingly, only an ordained priest can serve as the Roman Catholic chaplain at the Mental Hospital.

The superintendent, as appointing authority, was the only individual at the Mental Hospital authorized to act on behalf of the Mental Hospital to accept or to reject an individual's application for employment for a civil service position. To fill the position of chaplain at the Mental Hospital, an applicant would have to, *inter alia,* fill out an employment application for the State of Ohio and be appointed by the appropriate state official to the position. Neither the Roman Catholic Church nor the Franciscan Order may unilaterally fill a state civil service position and neither had a legal responsibility to provide a replacement for such a vacancy.

Sometime prior to August 1972, Father Waldschmidt was asked by the Franciscan Order whether he would be willing to become the chaplain at the Mental Hospital and Father Waldschmidt indicated he was so willing. By letter dated August 21, 1972, the Franciscan Order advised Father Waldschmidt that he had been appointed by the Franciscan Order to the chaplaincy of the Mental Hospital. Father Waldschmidt submitted an application for employment. Father Waldschmidt understood that, although he had been assigned to the Mental Hospital by his religious superiors, he had not been hired as the chaplain and would not be until and unless the superintendent of the Mental Hospital acted favorably upon his application form and appointed him to the position. Subsequently, Father Waldschmidt was selected by the Mental Hospital for the position. There was no written contract between the State of Ohio (including the Department of Mental Health) and the Roman Catholic Church (including the Franciscan Order) under which Father Waldschmidt performed his duties as chaplain at the Mental Hospital.

The Provincial Council of the Franciscan Order has acted as the personnel placement board for the order. At least since 1954, it selected the priest to apply for the vacated position and recommended him to the ad-

ministrator of the Mental Hospital for the position. On each occasion, the administrator selected the priest recommended by the Council to serve in the position of chaplain.

The Mental Hospital did not interfere with the manner in which Father Waldschmidt conducted his priestly functions except where it would violate the rules and regulations governing the care of the patient. Father Waldschmidt had an annual visitation by his religious superior and various other visits by other members of the Franciscan Order. These occasions afforded the opportunity for these individuals to observe and comment on Father Waldschmidt's performance. Father Waldschmidt was required by the Franciscan Order to assure that there was always a Roman Catholic chaplain available to patients of the Mental Hospital and, accordingly, was not permitted by the Franciscan Order to be absent from the Mental Hospital unless a replacement priest was available for the period of time he would be absent.

During the tax years in question, Father Waldschmidt received payroll checks issued by the State of Ohio and payable to Father Waldschmidt, not to his religious order, for the services performed as a chaplain at the Mental Hospital. Father Waldschmidt remitted all amounts received from the State of Ohio during the tax years in question to the Franciscan Order. As a chaplain at the Mental Hospital, Father Waldschmidt was eligible to participate in the state retirement benefit plan and to receive benefits such as sick leave, vacation leave, paid holidays, health insurance, and life insurance. The State of Ohio treated Father Waldschmidt as a permanent full-time employee of the state.

## B. *The Federal Income Tax Returns*

The taxpayers timely filed federal income tax returns for the tax years in question. On these returns, the taxpayers reported as gross income all amounts received for their chaplaincy services; however, the taxpayers excluded from adjusted gross income all of the amounts received for chaplaincy services. Upon audit, the IRS disallowed the exclusion from adjusted

gross income of the taxpayers' salaries as chaplains. A timely claim for refund was filed but was denied. The taxpayers then commenced suits in the Claims Court.

The parties filed partial stipulations of facts and filed cross-motions for summary judgment. Both parties asserted that they were entitled to summary judgment based on this court's decision in *Fogarty v. United States*.[3] Following a hearing on the parties' motions, the Claims Court held that the United States was entitled to summary judgment, concluding that the taxpayers had earned income as chaplains at the respective hospitals in their individual capacities and not as agents of the Franciscan Order. The taxpayers' complaints were dismissed.

### Analysis

In reviewing whether the Claims Court correctly entered summary judgment against the taxpayers, we apply the same legal standard as that applied by the trial court in determining whether summary judgment was appropriate.[4] Summary judgment may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5] Here, all material facts were stipulated by the parties. Only the legal issues remained.

The Internal Revenue Code imposes a tax on the taxable income of *"every"* individual (unless statutorily exempted or excluded),[6] and it defines gross income as *"all* income from whatever source derived."[7] Thus, in considering whether the income of certain individuals is not taxable to those individuals, we are looking to de-

part from a thoroughfare heavily traveled in one direction and from which the exits are very few and extremely narrow.

The question whether a member of a religious order earns income in an individual capacity, or as an agent of his order, is one of law based on general principles of agency to be established by considering all of the underlying facts.[8] There are no hard and fast rules.[9] The unique facts in each case will inevitably lead the court to place more emphasis on one or more factors and less on others.[10]

The taxpayers do not dispute that the legal principles set forth in *Fogarty* control the outcome of their cases. Rather, the taxpayers contend that the Claims Court's failure to consider and apply to the facts of their cases all "six factors" set forth in *Fogarty* to reach its decision is reversible error. We disagree.

In *Fogarty*, we addressed the issue whether a member of a religious order, who is subject to vows of poverty and obedience, earned income in an individual capacity or, alternatively, earned income as an agent of his religious order. In that case, we gave, by way of example only, some considerations that may be relevant to this legal issue. These included the following: (1) the degree of control exercised by the order over the member, (2) the ownership rights between the member and the order, (3) the purposes or mission of the order, (4) the type of work performed by the member vis-a-vis the purposes or mission of the order, (5) the dealings between the member and the third-party employer, and (6) the dealings between the employer and the order.[11] However, we did not intend to formulate rigid standards. Rather, we adopted a flexible approach that would balance the diverse factual circumstances

---

3. *Fogarty v. United States*, 780 F.2d 1005 (Fed. Cir.1986).

4. *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987).

5. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986).

6. 26 U.S.C. § 1 (emphasis supplied).

7. *Id.* § 61 (emphasis supplied).

8. *Fogarty*, 780 F.2d at 1012.

9. *Id.*

10. *Id.*

11. *Id.*

of each case against the basic principle of income taxation that income is taxable to the person who earns it.[12] We reject all approaches that attempt to specify particular factors that must be considered in determining the issue at bar.[13]

The taxpayers further argue that the Claims Court's analysis is flawed because it only recites the similarities between the taxpayers' cases and the facts set forth in *Fogarty*. The taxpayers contend that an examination of the significant differences involved between the taxpayers' cases and Father Fogarty's case necessarily leads to the conclusion that the taxpayers were acting as agents of the Franciscan Order in carrying out the mission of the order. We are unpersuaded.

Father Fogarty was a Roman Catholic priest and a member of the Society of Jesus religious order (Jesuit Order) who was instructed by his religious superiors to accept a teaching position at the University of Virginia's Department of Religious Studies. Teaching is an essential and traditional mission of the Jesuit Order. Although Father Fogarty's teaching duties were determined by the University of Virginia, Father Fogarty's acceptance and retention of the position was subject to the dictates of his religious superior. There was, however, no employment agreement between the University of Virginia and the Jesuit Order. Father Fogarty received monthly payroll checks made payable to him individually, which checks were deposited in a checking account in the name of Father Fogarty's religious order. Father Fogarty's entire salary went to his religious order and the order provided him with living expenses.

After a careful review of the record and of the arguments presented on appeal, we must conclude that the taxpayers' cases are not distinguishable from *Fogarty*. Both the taxpayers and Father Fogarty were directed by their religious superiors to pursue positions at secular institutions. Because of their vows of obedience and poverty, the taxpayers, like Father Fogarty, were required to accept those positions and were not entitled to keep the income earned as compensation. Instead, as in *Fogarty*, this income was turned over by the taxpayers to their religious order and their order provided them with living expenses.

Moreover, while occupying their positions, the taxpayers, as was Father Fogarty, were pursuing essential and traditional missions of their religious order. Here, the taxpayers pursued the Franciscan Order's mission of serving and administering to the poor and to the infirm, by serving as chaplains in federal and state hospitals whereas, in *Fogarty*, Father Fogarty pursued the Jesuit Order's mission of teaching by teaching courses on Catholic religious thought, development, and history at the University of Virginia.

Finally, we recognize no distinguishable difference in this case vis-a-vis *Fogarty* either as to the dealings between the taxpayers and the hospitals or as to the dealings between the hospitals and the Franciscan Order. Here, as in *Fogarty*, the contractual employment relationship existed solely between the individual taxpayers and the hospitals. The taxpayers' cases, like Father Fogarty's case, involved no agreement between the hospitals and the religious order. The sole dealing between the Franciscan Order and the hospitals was making the taxpayers available to fill the hospitals' openings in their chaplaincy positions.[14] Although the hospitals may have looked to the Franciscan Order as a source

12. *See, e.g., United States v. Basye,* 410 U.S. 441, 447, 93 S.Ct. 1080, 1084, 35 L.Ed.2d 412 (1973); *Lucas v. Earl,* 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

13. Such approaches include the two-part test applied to the "loaned out" employee situation in *Johnson v. United States,* 698 F.2d 372 (9th Cir.1982), and the "triangle theory" test relied upon by the Commissioner of Internal Revenue in *Schuster v. Commissioner,* 84 T.C. 764 (1985),

*aff'd on other grounds,* 800 F.2d 672 (7th Cir. 1986).

14. This is not to say that, as a requirement for agency status, the dealings between the employers (hospitals) and the third party (the Franciscan Order) need rise to the level of an oral or written agreement since, as previously discussed, we have rejected any so called "triangle theory" which requires contractual agreement between the employer and the third party.

of candidates to fill their chaplaincy vacancies, all applications for those positions were processed in accord with the usual hiring procedures of the hospitals. The appointment or rejection of a candidate for a chaplaincy position rested within the exclusive discretion of the hospital authorities.

### *Conclusion*

For the reasons discussed, the Claims Court's judgments, dismissing the taxpayers' complaints seeking a refund of income taxes paid for the tax years in question, are affirmed.

AFFIRMED.

Such a relationship, however, would be objective evidence that may be considered. *See Fogarty*, 780 F.2d at 1012.